# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Steven K. Alukonis, Appellant/Respondent,

v.

Wayne K. Smith, Jr., Respondent/Appellant.

Appellate Case No. 2017-001441

Appeal From Spartanburg County
Phillip K. Sinclair, Family Court Judge

Opinion No. 5745
Heard February 11, 2020 – Filed July 22, 2020

## REVERSED AND REMANDED

Richard H. Rhodes and William Hardwick Rhodes, both of Burts Turner & Rhodes, of Spartanburg, for Appellant/Respondent.

Meliah Bowers Jefferson and Wallace K. Lightsey, of Wyche Law Firm, both of Greenville, for Respondent/Appellant.

Angela Johnson Moss, of the Seventh Circuit Public Defender's Office, of Spartanburg, Guardian ad Litem, pro se.

**HUFF, J.:** This matter involves cross-appeals over the custody of a minor child (hereinafter, Child) between Steven K. Alukonis, the maternal grandfather (hereinafter, Grandfather), and Wayne K. Smith, Jr., the natural father of Child

(hereinafter, Father), following the death of Katelyn Alukonis, Child's natural mother (hereinafter, Kate). Grandfather challenges the family court's award of primary custody to Father and the award of $10,000 in attorney's fees to Father. Father appeals the award of joint custody to Grandfather and the family court's failure to award him all fees and costs expended in this litigation. We reverse the award of primary custody to Father, reverse and remand the award of attorney's fees to Father, and remand for the family court to set a visitation plan for Father.

## FACTUAL/PROCEDURAL BACKGROUND

This is a very sad case stemming from a custody action brought about after Child's mother, Kate, committed suicide. Child was born on July 1, 2010, to Kate and Father. The two were never a couple, and Kate travelled back and forth with Child between South Carolina, where Father lived, and her family home in Florida— living in both states for various periods of time. Kate had mental health issues and worked only sporadically. While in both South Carolina and Florida, Grandfather provided financial support for Kate and Child, and also provided emotional and hands on support at all times while the two were in Florida. Grandfather, Kate's sisters, and Kate's step-mother were all very involved in Child's life. Prior to Kate's death, it appears Father engaged in limited interaction with Child, and then only when Child was present in South Carolina. Child was cared for, at times, by Father or his family members while in South Carolina, most often staying at Child's great-grandmother's home. When Kate committed suicide on August 18, 2015, in South Carolina, Father assumed custody of Child. After several encounters with Grandfather and/or his family, Father's family feared they would try to take Child back to Florida and refused to allow Kate's family any contact with Child. Grandfather brought this action and, a few months after Kate's death, he was awarded temporary custody of Child. Following this order, Child lived in Grandfather's home for another nineteen months.

A final hearing on the matter was held March 20-30, 2017. Following the submission of extensive testimony and evidence, the family court noted the amount of time Child spent living in Florida and in South Carolina.[1] It stated that when Kate and Child resided in Florida, Grandfather provided them with support, care,

---

[1] The family court initially found that at the time of the filing of this action, Child had spent half his life in Florida and half in South Carolina, but it subsequently amended such to provide Child had spent thirty-five months in Florida and twenty-eight months in South Carolina prior to the filing of this action. This finding is not challenged on appeal.

and a place to live. It found Grandfather would often parent Child when they lived in Florida because Kate was unable to do so. The family court found Grandfather financially supported Kate, and thus indirectly supported Child, while they were in South Carolina as well as in Florida. In addition, Grandfather provided direct financial support for Child while they resided in Florida when Kate was unable to care for Child. Therefore, the court ruled there was "clear and convincing evidence that [Grandfather] is a de facto custodian of . . . [C]hild, as there were periods that [Grandfather] was the primary caregiver for and financial supporter of . . . [C]hild, and that . . . [C]hild resided with [Grandfather] (and . . . [C]hild's mother) for a period of one year or more."

The family court next examined whether Father was unfit to parent Child, citing *Kay v. Rowland*, 285 S.C. 516, 331 S.E.2d 781 (1985), for the proposition that our courts recognize superior rights of a natural parent in a custody dispute with a third party and "[o]nce the natural parent is deemed fit, the issue of custody is decided." The court found Father had a civil, working relationship with the mother of his second child. Although the court noted the status of Father's relationship with the mother of his third child was questionable and his unsettled living arrangement was a concern, it determined this did not render Father unfit as a parent. The court found Father and his family had been involved with Child from shortly after Child's birth to the present. The court recognized Father did not visit Child or send any direct support or gifts to Child while he was in Florida. However, it found even when Kate and Child were in Florida, Father provided health insurance for Child and listed him as a beneficiary on his life insurance policy. It noted Father did not do much in the way of contact or support while Child was in Florida with Kate but found, once Child returned to South Carolina, Father was involved in his life and provided support and contact. The family court observed the text messages between Father and Kate demonstrated Father and his family were involved with Child and that Father provided support and care for Child. Although the court acknowledged Father's delay in responding to Kate was due to the dynamics of their relationship in that Father was not interested in having a relationship with Kate as she desired, it held Kate and Father "maintained a civil, working relationship for the sake of [Child]." The court discounted the Guardian Ad Litem's (GAL) concerns that Father was not present during Child's birth and did not visit Child while he was in the hospital,[2] explaining Father was unsure of Child's paternity. It similarly found the GAL's concern regarding Child's absence

---

[2] There were complications with Child's birth and he developed pneumonia, resulting in a nine-day stay in a neonatal intensive care unit at two different hospitals.

from Kate's memorial service did not impact Father's parental fitness, as this was due to Grandfather's filing of a custody action in Florida and a text message from Kate's sister refusing to assure Father that she and Grandfather did not want to "take" Child, such that Father was fearful Child would not return from Florida. The family court, therefore, concluded Father was a fit and proper parent to Child and found primary custody of Child should be awarded to Father.

The court, however, also found compelling circumstances existed to warrant making both parties joint custodians of Child, with Father the primary custodian and Grandfather the secondary custodian. The family court granted Father final decision-making authority with respect to Child, and noted Grandfather's designation as secondary custodian did not infringe on that decision-making authority. It set an extensive visitation schedule and ordered Father to take Child to grief counseling. The court ordered Grandfather to pay $10,000 of Father's requested $97,210.50 in attorney's fees and costs. It also ordered the parties to pay equal shares of the GAL's fees. Following a hearing on Grandfather's motion for reconsideration and to alter or amend, the family court refused to alter its ruling that Father was a fit parent and denied Grandfather's request for primary custody of Child, explaining, "The Court finds that its determination of compelling circumstances entitles [Grandfather] to expanded visitation with [Child], but does not overcome the superior custody rights of a fit natural parent." These cross-appeals followed.

## ISSUES

Grandfather challenges the family court's award of primary custody to Father asserting: the family court erred in finding that Father was a fit parent for custody; the priority of a natural parent to custody of a child over a third party is now a rebuttable presumption; and Grandfather qualified as a psychological parent or de facto custodian such that Child's best interests were for Grandfather to be awarded custody. Grandfather also appeals the award of $10,000 in attorney's fees to Father asserting that he should have prevailed on the custody award and, even assuming the family court properly awarded custody to Father, the subject action was required by Father's refusal to allow Grandfather any contact with Child. Father appeals the award of joint custody to Grandfather asserting: upon finding him to be a fit parent, the family court should have ended its inquiry; and the family court failed to provide an analysis of compelling circumstances that existed to warrant joint custody. Father also appeals the family court's failure to award him all fees and costs expended in this litigation since he prevailed on the issue of custody.

## STANDARD OF REVIEW

"In appeals from the family court, this [c]ourt reviews factual and legal issues de novo." *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). Thus, this court "has jurisdiction to find facts in accordance with its view of the preponderance of the evidence." *Lewis v. Lewis*, 392 S.C. 381, 384, 709 S.E.2d 650, 651 (2011). "However, this broad scope of review does not require the appellate court to disregard the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony." *Tomlinson v. Melton*, 428 S.C. 607, 611, 837 S.E.2d 230, 232 (Ct. App. 2019). "Therefore, the appellant bears the burden of convincing the appellate court that the family court committed error or that the preponderance of the evidence is against the court's findings." *Id.* at 611-12, 837 S.E.2d at 232.

## LAW/ANAYSIS

### I. Primary Custody

Grandfather argues the family court erred in denying him primary custody of Child. He asserts that while Father can support Child and safely monitor him during weekend or summer visitation, Father is not fit to be the primary custodian. Grandfather further asserts that even if Father is fit, Grandfather has rebutted the presumption that custody should be with the natural parent. He maintains Father only spent time with Child when it was convenient and showed a lack of interest in Child when Child was in Florida; Father is aloof to Child's emotions and needs and indifferent to his education and overall development; Father's testimony about his financial support of child is not credible; and there are inconsistencies in Father's and his witnesses' testimonies. Grandfather argues he is the psychological parent of Child and granting him primary custody would be in Child's best interests. He asserts he has been directly involved with the caring and nurturing of Child since birth and Child is very bonded with him. He contends he possesses the ten characteristics of a good parent as set forth by his expert, Dr. Jonathan Gould.

We agree with Grandfather that the family court erred in awarding primary custody to Father. First, the family court may have committed an error of law by relying solely on its finding that Father was a fit parent and, thereafter, failing to consider other compelling circumstances and the best interest of Child in making the primary custody determination. At any rate, in our de novo review, we find clear and convincing evidence of compelling circumstances to warrant our conclusion

the family court erred finding Father should receive primary custody over Grandfather.

Without a doubt, a natural parent has superior rights in a custody dispute with a third party. *Kay*, 285 S.C. at 517, 331 S.E.2d at 782. Our supreme court in *Kay* held, "[W]e recognize[] the superior rights of a natural parent in a custody dispute with a third party. Once the natural parent is deemed fit, the issue of custody is decided." *Id*. The court in *Kay* "placed a substantial burden on any third party attempting to take custody over a biological parent." *Moore v. Moore*, 300 S.C. 75, 79, 386 S.E.2d 456, 458 (1989). Additionally, "[g]enerally, there exists a *rebuttable presumption* that the right to custody of a minor child automatically reverts to the surviving parent when the custodial parent dies." *Dodge v. Dodge*, 332 S.C. 401, 410, 505 S.E.2d 344, 348 (Ct. App. 1998) (emphasis added). However, our courts have, since *Kay*, "also recognized that in all custody controversies, including those between natural parents and third parties, the best interest of the child remains the primary and controlling consideration." *Id.* "Indeed, the superior rights of the natural parent must yield where the interest and welfare of the child clearly require alternative custodial supervision." *Id. See also* S.C. Code Ann. § 63-15-230(A) (Supp. 2019) ("The court shall make the final custody determination in the best interest of the child based upon the evidence presented.").

The following criteria should be considered by the courts in determining custody when the claim of a natural parent is involved:

> 1) Whether or not the parent is fit, able to properly care for the child and can provide a good home;
>
> 2) The amount of contact in the form of visits, financial support or both, which the parent had with the child while it was in the care of the third party;
>
> 3) The circumstances under which temporary relinquishment of custody occurred; and
>
> 4) The degree of attachment between the child and the temporary custodian.

*Hogan v. Platts*, 312 S.C. 1, 3-4, 430 S.E.2d 510, 511 (1993) (citing *Moore*, 300 S.C. at 79-80, 386 S.E.2d at 458). "The rebuttable presumption standard requires a case by case analysis." *Moore*, 300 S.C. at 80, 386 S.E.2d at 458.

Our courts have sanctioned the award of custody to paternal grandparents over a fit parent based upon the best interests of the child. In *Cook v. Cobb*, 271 S.C. 136, 245 S.E.2d 612 (1978), our supreme court emphasized that the best interest of a child is paramount to the legal rights of a parent, stating as follows:

> The rule that obtains in this and practically all jurisdictions at the present day is, that the well-being of the child is to be regarded more than the technical legal rights of the parties, so that, following this rule, it is generally held that the child will not be delivered to the custody of either parent where it is not to its best interest. The right of the parent is not absolute and unconditional. The primary consideration for the guidance of the Court is what is best for the child itself. This is declared not only in specific terms by our statute . . . but it has been so declared time and again by the Court.

*Id.* at 140-41, 245 S.E.2d at 614-15 (quoting *Driggers v. Hayes*, 264 S.C. 69, 70, 212 S.E.2d 579, 579-80 (1975)). The court "base[d] [its] conclusion affirming custody in the grandparents, not on any inherent or statutory right that they might have to the custody of grandchildren, but rather on what i[t] regard[ed] to be in the best interests of the child under the facts of th[e] case." *Id.* at 143, 245 S.E.2d at 616.

This court first announced a four-prong test to determine "how a party establishes that he or she is the psychological parent to a child of a fit, legal parent" in *Middleton v. Johnson*, 369 S.C. 585, 595, 633 S.E.2d 162, 168 (Ct. App. 2006). That case involved an action by a non-biological third party seeking visitation of a child. 369 S.C. at 591-92 n.1, 833 S.E.2d at 166 n.1. The facts revealed that Middleton took an active role in the child's life from the time that he was three months old, believing initially that they were biologically related. *Id.* at 589, 833 S.E.2d at 164. When the child was around one year old, Middleton learned he was not the biological father. *Id.* Nonetheless, he continued to love and care for the child with the blessing of the mother, and Middleton and mother essentially entered into a joint custody arrangement. *Id.* When the child was nine years old, the mother terminated all contact between the child and Middleton. *Id.* at 589,

591, 833 S.E.2d at 164, 166.  This court reversed the denial of visitation to Middleton, finding overwhelming evidence to reverse the family court's finding that Middleton was not the child's psychological parent.  *Id.* at 604, 833 S.E.2d at 172.  However, we also cautioned that the decision in *Middleton* did not "automatically give a psychological parent the right to demand *custody* in a dispute between the legal parent and psychological parent," and stated "[t]he limited right of the psychological parent cannot usually overcome the legal parent's right to control the upbringing of his or her child."  *Id.*

In *Marquez v. Caudill*, our supreme court affirmed the family court's award of custody of a child to the child's stepfather over the maternal grandmother after the natural mother committed suicide.  376 S.C. 229, 233-34, 656 S.E.2d 737, 739 (2008).  In doing so, the court noted our courts recognized the notion of a psychological parent in *Moore*.  *Id.* at 241, 656 S.E.2d at 743. The court further approved this court's adoption of the four-prong test in *Middleton* for determining whether a person has become a psychological parent.  *Id.* at 241-42, 656 S.E.2d at 743.

> The four-prong test states that, in order to demonstrate the existence of a psychological parent-child relationship, the petitioner must show:
>
> (1) that the biological or adoptive parent[s] consented to, and fostered, the petitioner[']s formation and establishment of a parent-like relationship with the child;
>
> (2) that the petitioner and the child lived together in the same household;
>
> (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; [and]
>
> (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Id.* at 242, 656 S.E.2d at 743 (quoting *Middleton*, 369 S.C. at 596-97, 633 S.E.2d at 168).

The court in *Marquez* observed that this court in *Middleton* considered the first factor critical "because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child." *Id.* at 242, 656 S.E.2d at 744. The court further stated, "[t]his factor recognizes that when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced." *Id.* As to the second prong, the court observed "the requirement that the psychological parent and the child have lived together further protects the legal parent by restricting the class of third parties seeking parental rights." *Id.* at 243, 656 S.E.2d at 744. The court further noted that the last two prongs of the test were the most important of the four prongs "because they ensure both that the psychological parent assumed the responsibilities of parenthood and that there exists a parent-child bond between the psychological parent and child." *Id.* In discussing these prongs, the court declared that the psychological parent must undertake the obligations of parenthood by being affirmatively involved in the child's life, the psychological parent must assume caretaking duties and provide emotional support for the child, and such duties must be done for reasons other than financial gain, thereby guaranteeing that a paid babysitter or nanny could not qualify as a psychological parent. *Id.* Finally, the *Marquez* court observed this court "noted that when both biological parents are involved in the child's life, a third party's relationship with the child could never rise to the level of a psychological parent, as there is no parental void in the child's life." *Id.*

Utilizing the four-prong test, the *Marquez* court found the child's stepfather met the requirements of a psychological parent and concluded the family court appropriately determined it was in the child's best interest for the stepfather to have custody of him over the maternal grandmother. *Id.* at 245, 656 S.E.2d at 745. Importantly, however, the court recognized that *Marquez* was a custody action between a stepfather and a grandmother and did not involve custody rights of a natural parent. Accordingly, there was no reason to recognize the superior rights of a natural parent. *Id.* Further, the court found the grandmother could not step into her daughter's place, and the grandmother was merely a third party seeking custody. *Id.*

In 2006, our legislature adopted section 20-7-1540 of the South Carolina Code, which has since been replaced by section 63-15-60. S.C. Code Ann. §§ 20-7-1540

(2006) and 63-15-60 (2010).  This section is titled "De facto custodian" and provides in pertinent part as follows:

> (A) For purposes of this section, "de facto custodian" means, unless the context requires otherwise, a person who has been shown by clear and convincing evidence to have been the primary caregiver for and financial supporter of a child who:
>
> (1) has resided with the person for a period of six months or more if the child is under three years of age; or
>
> (2) has resided with the person for a period of one year or more if the child is three years of age or older.
>
> Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child must not be included in determining whether the child has resided with the person for the required minimum period.
>
> (B) A person is not a de facto custodian of a child until the court determines by clear and convincing evidence that the person meets the definition of de facto custodian with respect to that child. If the court determines a person is a de facto custodian of a child, that person has standing to seek visitation or custody of that child.
>
> (C) The family court may grant visitation or custody of a child to the de facto custodian if it finds by clear and convincing evidence that the child's natural parents are unfit or that *other compelling circumstances exist*.

S.C. Code. Ann. § 63-15-60 (2010) (emphasis added).

While the de facto custodian statute provides for the best interests of the child to prevail by allowing visitation and custody rights to third parties when justified, it recognizes the superior rights of natural parents by requiring of third parties

seeking these rights a high standard of proof—clear and convincing evidence[3]—that a natural parent is unfit or there are other compelling circumstances warranting the same. Father does not contest the family court's finding Grandfather was a de facto custodian. Therefore this finding is the law of the case. *See Dixon v. Dixon*, 336 S.C. 260, 264, 519 S.E.2d 357, 359 (Ct. App. 1999) (holding an unappealed finding in a custody matter was the law of the case, as an unchallenged ruling, right or wrong, is the law of the case).

Regardless, under our de novo review, we find clear and convincing evidence that Grandfather is Child's de facto custodian. The record demonstrates Child resided over half his life with Grandfather prior to the commencement of this action and Grandfather was his primary caregiver during this time. When Child was a baby, Grandfather helped with whatever Kate needed, changing diapers, bathing Child, administering nebulizer treatments, getting up with Child in the middle of the night, feeding Child, and teaching Kate how to be a parent to Child. When Kate and Child were in Grandfather's home in Florida and Kate was mentally and physically very fragile, Grandfather cared for both Child and Kate. Additionally, when Kate and Child were in South Carolina, Grandfather remained in frequent contact with Kate by way of phone calls and text messages and continued to provide financial support.

Although not required to obtain custody under the de facto custodian statute, we find the evidence also establishes Grandfather was the psychological parent of Child. Turning to the facts of this case, we address the four-prong test adopted by this court in *Middleton*—and affirmatively approved by our supreme court in *Marquez*—used in determining whether a psychological parent-child relationship exists between Grandfather and Child.

The first prong to consider is whether the biological or adoptive parent consented to and fostered the alleged psychological parent's formation and establishment of a parent-like relationship with the child. *Marquez*, 376 S.C. at 242, 656 S.E.2d at 743. We find Kate consented to and fostered Grandfather's parent-like relationship with Child. When Child was a newborn in the hospital, Kate asked Grandfather to be in charge of decision making for Child and Grandfather orchestrated the transfer

---

[3] "Clear and convincing evidence is an elevated standard of proof, which lies between the lesser standard of 'preponderance of the evidence,' used in most civil cases, and the higher standard of 'beyond a reasonable doubt,' which is required in criminal cases." *Wise v. Broadway*, 315 S.C. 273, 282, 433 S.E.2d 857, 862 (1993) (Toal, C.J., dissenting).

of Child from one hospital to the other. Once Kate and Child were home with Grandfather in Florida, Grandfather took on the role of primary caregiver. Grandfather's daughter, wife, his neighbors, his friends, and Child's pre-school teacher characterized Grandfather as the father figure for Child while they were in Florida. There is no evidence Father objected to Grandfather's extensive and sustained role in raising Child. Through his own absence from Child's life, Father acquiesced to Grandfather taking on this role. Accordingly, we find Father was "a participant in the creation of the psychological parent's relationship with the child." *Id.* at 242, 656 S.E.2d at 744.

Second, the court must consider whether the alleged psychological parent and the child lived together in the same household. *Id.* at 242, 656 S.E.2d at 743. The trial court found, and it is uncontested, that Child had spent thirty-five months in Florida and twenty-eight months in South Carolina. Thus, the record clearly demonstrates Child lived the majority of his life in Grandfather's home prior to the institution of this action.

Third, the court must look at whether the alleged psychological parent "assumed obligations of parenthood by taking significant responsibility for the child's care, education, and development, including contributing towards the child's support, without expectation of financial compensation." *Id.* There is overwhelming evidence Grandfather provided financial support for Child while he was living with Kate in South Carolina and provided direct support while under his roof in Florida, all with no expectation of financial compensation. Further, the evidence is uncontested that Grandfather was often actively involved in the day to day care of Child from birth through the time this action was filed. Specifically, Grandfather was responsible for making medical decisions for Child, feeding, changing diapers, bathing, and potty training Child, administering nebulizer treatments to Child, and getting up with Child in the middle of the night. Grandfather also assumed Kate's responsibilities for Child in Florida when she faced her mental health crises and was unable to care for Child. Additionally, Grandfather took an active role in Child's education and provided emotional support for Child.

Last, the court must look at whether the alleged psychological parent "has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship that is parental in nature." *Id.* The evidence Grandfather meets this prong is also extremely strong. Testimony from numerous witnesses reveals that by the time this action was filed, Grandfather and Child had a very close relationship and a very clear bond of trust; while Kate and Child were living in Florida, Grandfather was the father figure for Child; Grandfather treated

Child like the son he never had; and while Child was in prekindergarten, he verbally identified Grandfather as his father. Further, although Grandfather's expert, Dr. Gould, acknowledged he had not performed an analysis of the nature and quality of Grandfather's relationship with Child before Kate's death, he testified that a child's forming of attachment is a process that occurs over time, and it was unlikely such began at the time of Kate's death given the significant contact Child had with Grandfather. Dr. Gould also testified that he was "absolutely blown away by the quality of interaction and the way [Child] takes to his grandfather," and found the quality of the relationship between the two was "absolutely extraordinary."

*Middleton* and *Marquez* place greatest importance on the last two prongs, and we find Grandfather has more than demonstrated he met these prongs, undertaking the obligations of parenthood by being affirmatively involved in Child's life, assuming the day to day caretaking duties, and providing emotional support for Child on a continuing basis. Additionally, we note, as stated in *Middleton* and *Marquez*, "when both biological parents are involved in the child's life, a third party's relationship with the child could never rise to the level of a psychological parent, as there is no parental void in the child's life." *Middleton*, 369 S.C. at 598, 633 S.E.2d at 169; *Marquez*, 376 S.C. at 243, 656 S.E.2d at 744. Because Father abdicated his parental role for much of Child's life prior to Kate's death, we believe he left a void there that was gladly and graciously filled by Grandfather.

If Father and Grandfather were on equal footing, we could resolve the case easily in Grandfather's favor. However, the law is very clear that the parties are not on equal footing. Whether Grandfather is a de facto custodian and/or a psychological parent to Child, Grandfather has a substantial burden to overcome in order to gain custody. *See Moore*, 300 S.C. at 79, 386 S.E.2d at 458 (observing our courts place a substantial burden on any third party attempting to take custody of a child over a natural parent). Father, as the natural parent, has superior rights to Child. *Hogan*, 312 S.C. at 3, 430 S.E.2d at 511. Additionally, there is a rebuttable presumption that the right to custody of Child automatically reverts to him as the surviving parent as a result of Kate's death. *See id.* ("There is a rebuttable presumption that the right to custody of their minor child automatically reverts to the surviving parent when the custodial parent dies."). The fact that one is determined to be a psychological parent does not, by itself, override the rebuttable presumption that it is in the best interests of a child to be in the custody of his biological parent. *See Moore*, 300 S.C. at 80-81, 386 S.E.2d at 459 ("Even though there may exist a psychological parent-child relationship, the mere existence of such a bond is inadequate ground to justify awarding permanent custody to a [non-biological

parent]."); *Middleton*, 369 S.C. at 604, 833 S.E.2d at 172 (cautioning that our decision did not "automatically give a psychological parent the right to demand *custody* in a dispute between the legal parent and psychological parent," and stating "[t]he limited right of the psychological parent cannot usually overcome the legal parent's right to control the upbringing of his or her child").  Even so, this presumption is rebuttable, and it requires a case by case analysis.  *Moore*, 300 S.C. at 80, 386 S.E.2d at 458.  Further, section 63-15-60 makes clear that a de facto custodian *may* receive custody of a child over a natural parent, even if the natural parent is fit, when there are "other compelling circumstances."  S.C. Code Ann. § 63-15-60(C) (2010).  However, "the best interest of the child remains the primary and controlling consideration in child custody controversies."  *Hogan*, 312 S.C. at 3, 430 S.E.2d at 511.

Our courts have identified the following criteria to be considered in determining custody when the claim of a natural parent is involved: (1) Whether or not the parent is fit, able to properly care for the child and can provide a good home; (2) the amount of contact in the form of visits, financial support or both, which the parent had with the child while the child was in the care of the third party; (3) the circumstances under which temporary relinquishment of custody occurred; and (4) the degree of attachment between the child and the temporary custodian.  *Hogan*, 312 S.C. at 3-4, 430 S.E.2d at 511; *Moore*, 300 S.C. at 79-80, 386 S.E.2d at 458.  While these factors have traditionally been considered in circumstances involving the temporary voluntary relinquishment of custody by a natural parent, we find them instructive in considering whether the presumption in favor of Father as the natural parent has been rebutted and compelling circumstances warrant awarding primary custody to Grandfather.  First, while we believe Father may be fit and able to properly care for Child, we are concerned about his ability to provide Child a good home given the instability of Father's living arrangements at the time of the trial.  Second, we find Father had very little to no contact with Child and provided limited financial support while Child was under Grandfather's care in Florida.  Third, while Father did not technically relinquish custody of Child, he tacitly condoned Child living in Florida under Grandfather's roof for the majority of Child's life and offered no explanation as to why he did not attempt to assume custody or even seek visitation of Child during these times.  Fourth, we find the evidence establishes an extremely strong degree of attachment between Child and Grandfather.

Additionally, the record shows Grandfather gladly has taken on the responsibilities of caring for Child, while Father shirked his responsibilities until the filing of this action.  From Child's birth on, Grandfather has been the primary source of financial

support.  Even when Child was with Kate in South Carolina, Grandfather visited and communicated with them often.  More importantly, Grandfather has been hands-on in the day to day tasks of caring for a young child while Child resided in his home.  Grandfather fed, bathed, and dressed child and took him to school and doctor's appointments.  He participated in extracurricular activities with Child such as soccer and Cub Scouts.  He worked with Child to ensure his academic success and provided counseling to ensure Child's emotional well-being.  For example, when Child initially enrolled in his Florida kindergarten after the November, 2015 temporary hearing, his teacher indicated Child may have to repeat the grade.  Child's report card from that time reflected he was not meeting expectations and had deficits in reading, writing, and mathematics.  His teacher testified he was also very shy and withdrawn.  However, with Grandfather's help, by May 2016, Child had made dramatic improvement in all areas.  At the time of the final hearing, Child was reading above grade level, his math was above level, and he was excelling socially.  In addition, Grandfather enrolled Child in a grief counseling program.  Child's counselor stated when he began the program he was shy, tentative, and reticent to attend, but over the year he blossomed into a child who felt secure and comfortable and he has benefited from the program.  Dr. Gould described the relationship between Grandfather and Child as "among the most extraordinarily positive and healthy I have observed."

On the other hand, Father was largely absent from Child's life during the time he lived in Florida.  Father provided limited financial support and never visited him in Florida.  Father was a part of Child's life when Child and Kate resided in South Carolina.  However, his family seemed to take care of Child more than Father did.  Father admitted Child stayed with him only two to three times during the two months Kate and Child lived in South Carolina before Kate's death.  Even after Kate died, Child stayed with Father's grandmother—Child's great-grandmother— more than he stayed with Father.  Also, tellingly, the text messages between Kate and Father during the last months of Kate's life reveal, while Kate often sought assistance from Father and his various family members in keeping Child, especially after Kate became employed, not one message showed Father actively sought to spend time with Child.[4]

---

[4] We further note, although Father testified his disagreements with Kate did not detrimentally affect his co-parenting with her and he denied declining to spend any time with Child during this period, their text messages reflect the contrary.  The text messages between Kate and Father reveal a contentious relationship between the two, with Kate displaying attempts to involve Father in her life as well as

We recognize that since the filing of this action, it appears Father committed himself more to parenting Child. Even the GAL, who seemed to favor Grandfather, described Child as flourishing during her observation of Father and his family at a restaurant. She heard Child call Father "dad or daddy" for the first time and she observed Child crawl into Father's lap to watch a video on his phone. She stated "I saw more connection, emotional connection, and he just seems to be doing very well the way the situation is." However, the situation to which the GAL referred was one in which Grandfather had primary custody and Father had visitation. The GAL attributed the improved relationship between Father and Child to the time Child spent in Florida under the care of Grandfather.

We do not discount that Father is a natural parent to Child—whose custodial parent died—and Father qualifies as a fit parent. As previously noted, "[g]enerally, there exists a rebuttable presumption that the right to custody of a minor child automatically reverts to the surviving parent when the custodial parent dies." *Dodge*, 332 S.C. at 410, 505 S.E.2d at 348. Further, as this court observed in *Middleton*, 369 S.C. at 604, 833 S.E. 2d at 172, a psychological parent does not automatically have the right to demand custody in a dispute with a natural parent. Additionally, for a de facto custodian to obtain custody of a child of a fit parent, he must meet the rigorous burden of proving by clear and convincing evidence that compelling circumstances exist to warrant such. S.C. Code Ann. § 63-15-60(C) (2010). However, we must also keep in mind that "in all custody controversies, including those between natural parents and third parties, the best interest of the child remains the primary and controlling consideration," and "the superior rights of the natural parent must yield where the interest and welfare of the child clearly require alternative custodial supervision." *Dodge*, 332 S.C. at 410, 505 S.E.2d at 348.

---

Child's life; Father often responding rudely, indifferently, or not at all; and Kate often responding to Father with anger. While Father made clear he was not interested in Kate's life and wanted her to only communicate with him regarding matters related solely to Child, the messages reveal Father's refusal to communicate was, at times, to the detriment of Child. In other words, Father put his need to avoid being involved in any way with Kate above the needs of Child. Though Father's affidavit submitted for the temporary hearing stated that he and Kate got along and co-parented Child from the beginning and, after Kate moved back to South Carolina in June 2015, they "continued to get along as always, because [they] always did," and they "raised [their] son together," the text messages certainly show otherwise.

We acknowledge that in most circumstances, a grandparent or other third party would find it an insurmountable obstacle to obtain custody of a child over a fit, natural parent. However, the record from the final hearing demonstrates that Grandfather established by clear and convincing evidence that compelling circumstances exist to award him primary custody of Child. Our review of the evidence persuades us there is overwhelming evidence primary custody with Grandfather is in the best interest of Child. Accordingly, we reverse the award of primary custody to Father and grant primary custody of Child to Grandfather.[5]

## II. Attorney's Fees

Both Father and Grandfather appeal the award of $10,000 in attorney's fees to Father. Father challenges the sufficiency of the award, arguing the family court erred in failing to award him all fees and costs expended in this litigation since he prevailed on the issue of custody. Grandfather argues that if this court determines he should be awarded custody, the award of attorney's fees should be reversed. He additionally contends, regardless of this court's custody determination, we should reverse the attorney's fees award because Father made this action necessary by denying Grandfather all contact with Child. He also asserts he prevailed in receiving substantial visitation with Child.

"In determining whether an attorney's fee should be awarded, the following factors should be considered: (1) the party's ability to pay his/her own attorney's fee; (2) beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) [the] effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476-77, 415 S.E.2d 812, 816 (1992). When determining the reasonableness of a fee award, the court should consider the following factors: "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; [and] (6) customary

---

[5] Based upon our determination that primary custody should be awarded to Grandfather, we need not reach Father's appeal of the award of joint custody to Grandfather. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues on appeal when its determination of a prior issue is dispositive).

legal fees for similar services." *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

Father's argument that the fees were insufficient is not preserved. While the court recited the factors for deciding whether to award attorney fees, it did not discuss the parties' ability to pay their own fees, their respective financial conditions, or the effect of the fee on each party's standard of living. Further, Father did not file a Rule 59 motion asking the family court to address these factors or asserting the award made was insufficient. Accordingly, we agree with Grandfather this issue is not preserved. *See Buist v. Buist*, 410 S.C. 569, 577, 766 S.E.2d 381, 385 (2014) (stating argument that the family court did not adequately apply the *Glasscock* or *E.D.M.* factors was not preserved when husband's argument in Rule 59(e) motion was not sufficiently specific); *Dodge*, 332 S.C. at 418, 505 S .E.2d at 352-53 ("The father's argument regarding the amount of the [GAL's] fee is not preserved for appeal inasmuch as the father failed to specifically raise the issue in his Rule 59(e), SCRCP, motion for reconsideration."). At any rate, in light of our decision to reverse the award of primary custody to Father, the basis for Father's request for additional fees fails.

Inasmuch as we reverse the family court's custody determination, we find it appropriate to reverse the award of attorney's fees to Father and remand the issue to the family court for consideration of the effects of this appeal. *See Sexton v. Sexton*, 310 S.C. 501, 503-04, 427 S.E.2d 665, 666 (1993) (reversing and remanding the issue of attorney's fees for reconsideration when the substantive results obtained by counsel were reversed on appeal). We note, while the family court recited the *E.D.M.* factors in its order, it did not specifically address these factors or make any findings thereon. On remand, the family court should set forth its specific findings of fact as to each of the *E.D.M.* factors in considering an award of attorney's fees, if any, to Father.[6]

## CONCLUSION

We hold, under our de novo review, Grandfather met the significantly higher burden required to show primary custody of Child should be placed with him over Father. He rebutted the presumption in favor of Father as the natural parent, and we find clear and convincing evidence that Grandfather is a de facto custodian and compelling circumstances warrant custody of Child being awarded to him. We

---

[6] For example, the family court may consider the expansive visitation awarded to Father, as well as Grandfather's absorption of visitation costs, in its analysis.

therefore reverse the award of primary custody to Father and grant primary custody to Grandfather.  We remand the case to the family court to set a visitation schedule for Father—in accord with the significant visitation Grandfather agreed in his testimony should be given to Father—as well as to consider Grandfather's testimony concerning his willingness to absorb many of the costs associated with Father's visitation.  We also reverse and remand the issue of attorney's fees to Father.  In recognition of the need to bring stability to Child's living arrangement, we direct the family court to hold the remand hearing as expeditiously as possible.

**REVERSED AND REMANDED.**

**THOMAS and MCDONALD, JJ., concur.**